# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHARLES A. VON DECK,**
**LORIE A. LINDE, and**
**JAMES VON DECK**,

      Plaintiffs,

             **Case No. 03-C-558**

**SHAWANO COUNTY**
**DEPARTMENT OF SOCIAL SERVICES,**

      Defendant.

**DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Charles A. Von Deck ("Von Deck") and Lorie A. Linde ("Linde") commenced this 42 U.S.C. § 1983 action for monetary damages against Shawano County Department of Social Services ("DSS") on behalf of James Von Deck ("James"), their son, and on their own behalf. The plaintiffs allege that DSS violated their Fourth Amendment right against unreasonable seizures when it removed James from their home. DSS has filed a motion for summary judgment, claiming (1) that the plaintiffs' Fourth Amendment rights were not violated and (2) that the plaintiffs have not presented evidence sufficient to hold DSS, a municipality, liable under § 1983. The defendant's motion has been fully briefed and is now ready for resolution. In addition, the parties have consented to exercise of this court's full jurisdiction, including the entry of final judgment. 28 U.S.C. § 636(c); FED. R. CIV. P. 72(c).

## STATEMENT OF FACTS

In support of its motion for summary judgment, DSS submitted proposed findings of fact that detail its removal of James from the plaintiffs' residence. The plaintiffs, who are now proceeding pro se, filed a response to DSS's motion for summary judgment in which they dispute DSS's description of James' removal. An account of the relevant events from the perspective of DSS will be discussed first.

### I. The Position of DSS

According to DSS, a confidential source claimed that Von Deck and Linde lived in an unsanitary residence, verbally abused James, neglected James, and did not adequately supervise James due to Linde's poor health condition. Richard Kane ("Kane"), the deputy director of DSS, believed this information to be credible. In an attempt to investigate the allegations further, Kim Wolfmeyer ("Wolfmeyer"), a DSS intake worker, went to the plaintiffs' residence.

The first visit took place on April 17, 2002. According to Wolfmeyer, the plaintiffs' residence was filthy. She states that there were stacks of dirty dishes containing rotten food, insect infestations on the dishes and in the kitchen, rotten food, and that the living room was cluttered to the point that it was difficult to walk. In addition, Wolfmeyer reports that Linde was agitated and irrational, said she hid knives around the house because "the system" was out to get her, and said she had significant health problems. Based on these observations and her conversation with Linde, Wolfmeyer claims that she believed James needed additional supervision. Accordingly, Wolfmeyer scheduled a second home visit for the following day.

2

At the agreed upon time the next morning, Wolfmeyer and Nurse Darrell Smith ("Nurse Smith") arrived at the plaintiffs' residence. Wolfmeyer knocked, but Linde did not answer the door. Wolfmeyer believed Linde was home, because Linde said she would be home, Linde said she could not drive, and Von Deck's car was not there, and Wolfmeyer heard noises from inside the residence. After repeatedly knocking and announcing her presence, Wolfmeyer opened the door to the residence and entered because she was concerned that Linde was incapacitated or had mentally deteriorated, leaving three year old James in immediate danger.

Almost immediately, Wolfmeyer says that Linde sprang from behind the couch, growled, yelled, and charged towards her. In addition, James appeared from behind the couch looking dirty, pale, and wearing shoes and clothes that did not fit him. Nurse Smith then entered the residence, but Linde continued yelling, stating that she was afraid of Nurse Smith and afraid that James would be removed from her custody. Based these events, Wolfmeyer requested that law enforcement officers assist her at the residence and sought an emergency detention hold on Linde. In addition, after consulting with Kane, Wolfmeyer decided that James should be removed from the plaintiffs' residence.

However, Linde eventually calmed down, and neither an emergency detention nor law enforcement officers were required. Wolfmeyer informed Linde that she would temporarily place James with a family member, and Linde indicated that James should stay with her sister, Sara Rasmussen ("Rasmussen"). Wolfmeyer then completed a Temporary Physical custody Request for James and left a copy for Linde on the table. This upset Linde further and, from Wolfmeyer's perspective, the situation re-escalated. Shortly thereafter, Von Deck arrived home, agreed to take Linde for a psychological assessment at DSS, and eventually took Linde to DSS to meet with

3

Wolfmeyer further. Wolfmeyer then placed James in her car and took him to DSS where he was later picked up by Rasmussen.

During the meeting at DSS's office later that day, Linde continued to be agitated and was screaming. However, Von Deck remained calm, and Wolfmeyer informed both plaintiffs that they had a right to a court hearing regarding the physical custody of James. In addition, Wolfmeyer claims that she informed Linde and Von Deck that DDS's temporary custody of James would last only forty-eight hours and that, after that time, they must either choose to comply with a Voluntary Safety Plan or attend a court hearing. Stating that they did not want to go to court, Linde and Von Deck agreed to the Voluntary Safety Plan, which required, among other things, that James remain in the custody of an approved relative. The plaintiffs signed the Safety Assessment and Plan form, and the plan was carried out until May 9, 2002, when James was returned to the custody of Linde and Von Deck.

## II. The Position of the Plaintiffs

The plaintiffs' response to the defendant's proposed findings of fact falls far short of the requirements under both the federal and local rules. The plaintiffs' response consists of their statements, unsupported by any references to the record. The fact that the plaintiffs are now proceeding pro se permits the court to deal with their submission with some flexibility, and therefore, the court will consider the plaintiffs' statements as true for purposes of summary judgment.

The plaintiffs' description of the encounter between Linde and Wolfmeyer is markedly different. According to the plaintiffs, Linde was upset but cooperative at the time of Wolfmeyer's first visit, and the house was not unsanitary. In addition, plaintiffs state that Linde was not as angry and irrational as Wolfmeyer claims. Also, plaintiffs deny that Linde said she had knives hidden around the house or that law enforcement officials were out to get her.

4

In regard to Wolfmeyer's second visit, the plaintiffs claim that Wolfmeyer did not announce herself before entering the home, that Wolfmeyer came to the residence before the agreed upon time, and that Linde and James believed someone was breaking into their home. In addition, the plaintiffs dispute that Wolfmeyer had reason to believe that Linde and James were home, and claim that Wolfmeyer could not have heard noises coming from inside the house. Moreover, because Linde was more than seven months pregnant, plaintiffs claim that she could not have sprung from behind the couch at Wolfmeyer.

In regard to the interaction between Wolfmeyer and Linde, plaintiffs deny that Linde charged at Wolfmeyer, that Linde growled or yelled, that Wolfmeyer informed Linde that she called the police, and that Wolfmeyer informed Linde that she would be taking James. Quite the opposite, plaintiffs claim that Wolfmeyer sneaked out of the house with James and was planning to transport James without a child protective safety seat.

Furthermore, at the subsequent meeting with Wolfmeyer at DSS's office, plaintiffs claim that Linde did not scream, despite Wolfmeyer's efforts to provoke her. In addition, plaintiffs state that Wolfmeyer kept them waiting for several hours and never informed them of their right to a court hearing. Instead, the plaintiffs claim that Wolfmeyer said that the only way to get James back was to comply with the voluntary safety plan, as a court hearing could take several weeks.

### SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgement as a matter of law. FED. R. CIV. P. 56(c). Material facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material

5

fact is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. 317, 323 (1986). The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## ANALYSIS

As stated earlier, DSS makes two arguments in support of its motion for summary judgment: that the plaintiffs' Fourth Amendment rights were not violated as a matter of law and (2) that the plaintiffs have not presented evidence sufficient to hold DSS, a municipality, liable under § 1983. The Fourth Amendment claim will be discussed first.

**I. Fourth Amendment: Reasonable seizure**

In support of its first claim, DSS states that its seizure of James was reasonable. Citing Brokaw v. Mercer County, the plaintiffs claim that the removal of a child is reasonable if it (1) is

6

conducted pursuant to a court order, (2) is supported by probable cause, or (3) is justified by exigent circumstances—meaning that the state officers had reason to believe that life or limb is in immediate jeopardy. (DSS Br. 7 citing Brokaw, 235 F.3d 1000, 1010 (7th Cir. 2000).). DSS claims that its removal of James was reasonable under Brokaw because it was supported by probable cause and based on exigent circumstances. In addition, DSS argues that the removal was carried out in a reasonable manner. Thus, DSS concludes that it did not—as a matter of law—violate the Fourth Amendment, which protects against *un*reasonable seizures only.

In light of the many factual disputes regarding DSS's removal of James, summary judgment is not appropriate on the basis that the removal was reasonable. Indeed, if the plaintiffs' residence was sanitary, Linde did not exhibit the behavior described by Wolfmeyer, and Wolfmeyer entered the plaintiffs' residence unannounced prior to the time when Linde was expecting her, the court cannot say as a matter of law that a jury would find DSS's actions reasonable. There are material facts in dispute, and summary judgment is not appropriate on the issue of reasonableness.

### II. Municipality Liability Under 42 U.S.C. § 1983

In its second argument, DSS claims that summary judgment is appropriate based on the fact that it is a municipality. For the reasons discussed below, this court agrees.

The fact that DSS is a municipality means that it cannot be held vicariously liable for the acts of its employees under § 1983 based on a theory of respondeat superior. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978); Bradich ex re. Estate of Bradich v. City of Chicago, 413 F.3d 688, 690 (7th Cir. 2005); Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003). Rather, "it is when the execution of a government's policy or custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

7

injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694; Baxter by Baxter v. Vigo County School Corp., 26 F.3d 728, 734 (7th Cir.1994).

A plaintiff can establish that a municipality's official policy violated his civil rights in one of three ways: (1) by proving that an express municipal policy caused the alleged constitutional deprivation, (2) by demonstrating that a widespread practice, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) by showing that the deprivation was caused by a person vested with final policymaking authority. Brokaw v. Mercer County, 235 F.3d 1000, 1013 (7th Cir.2000); Garrison v. Burke, 165 F.3d 565, 571-72 (7th Cir.1999); Kujawski v. Board of Commissioners of Bartholomew County, 183 F.3d 734, 737 (7th Cir.1999); McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir.1995). In the present case, the plaintiffs responded to DSS's motion for summary judgment by disputing the factual events of James' removal and by claiming that DSS has "trampled upon" their rights. (Pl. Resp. at 4.). From a legal standpoint, the plaintiffs' conclusory response fails to address any of the theories by which municipal liability can be established. The plaintiffs do not allege that an express municipal policy or a widespread practice caused a violation of the Fourth Amendment. Therefore, the court's focus will be the third method of municipal liability, and summary judgment will depend on whether Kane or Wolfmeyer, the two DSS employees responsible for James' removal, were vested with final policymaking authority.

To determine whether an employee is a final policy maker, the court must look to state law. Pembaur v. City of Cincinnati, 475 U.S. 469, 481-83 (1986). In order to have final policymaking authority, an official must possess "[r]esponsibility for making law or setting policy," that is, "authority to adopt rules for the conduct of government." Rasche v. Village of Beecher, 336 F.3d 588,

599-600)(7th Cir. 2003)(citing Auriemma v. Rice, 957 F.2d 397, 401 (7th Cir.1992)).  Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority.  Vela v. Village of Sauk Village, 218 F.3d 661, 665 (7th Cir. 2000).  Moreover, in commenting on the type of policy making authority that is "final," the Seventh Circuit stated as follows:

> Every public employee, including the policeman on the beat and the teacher in the public school, exercises authority ultimately delegated to him or her by their public employer's supreme governing organs.  A police officer has authority to arrest, and that authority is "final" in the practical sense that he doesn't have to consult anyone before making an arrest; likewise a teacher does not have to consult anyone before flunking a student.  That is a perfectly good use of the word "final" in ordinary conversation but it does not fit the cases; for if a police department or a school district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior. To avoid this the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has ***authority that is final in the special sense that there is no higher authority.***

Rasche, 336 F.3d at 600 (citing Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 469 (7th Cir.2001).

With these principles in mind, the court concludes that neither Wolfmeyer nor Kane had final policy making authority. Wolfmeyer's authority as an intake worker is governed by Wisconsin Statute § 48.067.  Her duties include receiving referral information, conducting intake inquiries, screening children that are taken into custody, determining whether children or expectant mothers should be held, providing crisis counseling during the intake process, referring cases to other agencies, and making interim recommendations to the court concerning persons awaiting final disposition.  Wis. Stat. § 48.067(1), (4)-(8).  None of Wolfmeyer's duties include policy making.  Moreover, it is clear

9

that she is not the "final" authority regarding child removal. In fact, in the present case, Wolfmeyer removed James from the plaintiffs' custody only after consulting with Kane.

Like Wolfmeyer, Kane too was not the "final" policy-making authority under Wisconsin law. The Wisconsin Statutes do not specify Kane's duties as deputy director. However, in describing the department of social services, Wisconsin Statute § 46.22(1) states that the department shall consist of a county social services board, a county social services director, and necessary personnel. Since the position of deputy director is not specified, this means that the position is classified as "necessary personnel" under Wisconsin law. This alone would indicate that Kane does not have final policy making authority. More significant, however, is the fact the county social services board is specifically designated as the policy-making body. Pursuant to Wisconsin Statute § 46.22(2)(c), the board is charged with determining the "broad outlines and principles governing the administration of the functions, duties and powers assigned to the county department of social services." Moreover, at the time of James' removal, Ronald N. Stuber ("Stuber") was the director of DSS, and Kane acted as his deputy. See Shawano County Soc. Serv. Bd., Resolution No. 120-04 (Dec. 15, 2004)(available at http://www.co.shawano.wi.us) (approving Kane as director). Thus, while Kane may have had some supervisory authority within DSS, if anyone outside the county social services board would be deemed to have "authority that is final in the special sense that there is no higher authority," it would be Stuber and not Kane. Accordingly, municipal liability cannot be based on the actions of Kane or Wolfmeyer, and DSS's motion for summary judgment will be granted.

10

For all the reasons stated herein, the court now enters the following order on DSS's motion for summary judgment:

**IT IS THEREFORE ORDERED** that the defendant Shawano County Department of Social Service's motion for summary judgment is **granted.** The Clerk shall enter judgment **dismissing** the plaintiffs' complaint and this case with prejudice.

Dated at Milwaukee, Wisconsin, this <u>31st</u> day of August, 2005.

<u>s/AARON E. GOODSTEIN</u>
United States Magistrate Judge
